# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| **RICHARD D. EXE and DONA EXE,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | CAUSE NO. 1:11-cv-70 |
| ) | |
| **FLEETWOOD RV, INC.,** ) | |
| ) | |
| **Defendant,** ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Richard and Dona Exe are suing Fleetwood RV, Inc., because they contend that the high-end Fleetwood recreational vehicle they purchased—commonly called an "RV"—was plagued from the start by defects, mostly centered on the unit's electrical system. They sue under the federal Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301-2312, for Fleetwood's alleged failure to comply with the terms of a written or implied warranty, or more particularly, for failing to repair, despite reasonable opportunities, the unit's warranty-covered defects.

Eventually, both sides of the dispute submitted the unit to inspection by their respective experts, and it is the conduct of Fleetwood's representatives at that event that forms the basis for the Exes' present motion for sanctions. (Docket # 73.) In short, the Exes, who were present at Fleetwood's November 9, 2011, inspection, contend that Fleetwood's in-house expert, Doug Haas, and its corporate representative, Barry Krueckeberg, took that opportunity to spoliate evidence.

Zeroing in on three things in particular, the Exes contend that while inspecting the unit,

Haas and Krueckeberg intentionally: (1) switched a bolt securing two cables to a buss bar (the parties call the alleged new bolt, "the shiny bolt"); (2) screwed down a box housing relay systems (the "TriMark box") that was purportedly flopping around in a storage compartment; and (3) corrupted a video the two Fleetwood representatives made during the inspection that allegedly captured the malfunctioning of the unit's leveling system. (Docket # 73-1.) Therefore, as the Exes see it, Fleetwood should be sanctioned by the entry of a judgment in their favor for the full purchase price of the RV. Fleetwood, not surprisingly, vehemently denies the allegations.

On November 13, 2012, District Judge Joseph Van Bokkelen referred the Exes' motion for a report and recommendation (Docket # 88), and I conducted a two-day evidentiary hearing on April 8-9, 2013 (Docket # 135-36). The evidence was confined to the issue concerning the shiny bolt and the TriMark box, as I deemed the record sufficiently developed on the question of whether Fleetwood spoliated the video. (*See* Docket # 111.) The evidentiary record remained open after the hearing for objections to the deposition testimony and affidavit of John Jewell, the Exes' retained expert, who died on February 11, 2013, while the motion was pending. (*See* Docket # 120, 136.) The briefing on these matters concluded on May 6, 2013 (Docket # 138, 143), and shortly thereafter I excluded Jewell's affidavit in its entirety (Docket # 144) and took Fleetwood's objections to Jewell's deposition testimony under advisement.

Following the evidentiary hearing and preparation of a transcript,[1] counsel submitted post-hearing briefs and responses, as well as proposed findings of fact and conclusions of law, and the matter is now ripe for ruling. (Docket # 145-48.) For the following reasons, I

---

[1] Reference to the hearing transcript is made as "(Tr. __)". Hearing Exhibits are referenced as "(Ex. __)" and deposition excerpts are noted as "(__ Dep. __)".

recommend denying the Exes' motion for sanctions.[2]

## II. FINDINGS OF FACT[3]

The Exes purchased the RV, a 2010 Fleetwood Revolution 42-foot, for $271,000 from a dealer in Arizona in February 2010. (Tr. 9, 30, 32.) On October 20, 2010, the Exes filed the instant suit against Fleetwood under the MMWA, alleging that the RV has some electrical or electronic problems—causing, among other things, the side-room slide outs to malfunction by either failing to operate or failing to retract—which Fleetwood repeatedly failed to cure under warranty. (Docket # 1.) As of the date of the evidentiary hearing, the RV had logged only about 8,000 miles. (Tr. 9.)

### A. *Jewell's Preliminary Inspection on November 14, 2010*

Prior to filing suit, the Exes had the RV inspected by John Jewell on November 14, 2010, at Jewell's shop near Milwaukee, Wisconsin. (Tr. 33, 35-36, 89.) The Exes and their attorney, Lawrence Towers, attended the inspection. (Tr. 36.) Prior to the inspection, Jewell reviewed a packet of repair records and manuals that he had been provided about the RV. (Jewell Dep. 81; Tr. 36-37; Ex. 3.) Jewell took no pictures or notes during the inspection. (Jewell Dep. 83; Tr. 14, 90-91, 101.) At some point during the inspection, Richard Exe remembers Jewell reaching down inside the compartment under the third entry step of the RV to "pick[] up the Trimark box and literally lift[] it out of the compartment," with the comment that it was "pretty shoddy work." (Tr. 39; *see* Tr. 12-13, 38, 46, 93.) Exe observed that the

---

[2] The motion for sanctions fares no better even if Jewell's deposition testimony is considered and therefore with respect to the motion for sanctions only, Fleetwood's objections to Jewell's deposition are MOOT.

[3] Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated into Section III and any Conclusion of Law in Section III deemed to be a Finding of Fact is hereby incorporated into this Section.

3

TriMark box was unsecured and was dangling in the compartment by its wires, which allowed Jewell to lift it out of the compartment. (Tr. 51, 111, 188.)

Over eight months later, on August 1, 2011, in preparation for mediation set for the following week, Jewell produced a "preliminary expert report" summarizing his November 14, 2010, inspection, noting, in part, that "[a]n electrical assembly containing relays and various other electrical components, as well as the assembly's wire harness were not mounted, rather the assembly was left to flop around in a storage compartment under the entrance steps." (Ex. 3; *see* Tr. 79-80.) On August 6, 2011, Towers e-mailed Jewell's preliminary report to Bruce Terlep, Fleetwood's counsel. (Exs. 8, GG, UU; Towers Aff. ¶ 8; Tr. 53, 292-93.) Terlep, however, claims that this e-mail went into his spam filter and, as a result, denies seeing Jewell's preliminary report either prior to the mediation or Fleetwood's subsequent November 9, 2011, inspection. (Exs. 8, GG, UU.) Although there is some conflicting evidence on this point,[4] Haas, Fleetwood's Research and Development Engineering Manager, and Krueckeberg, Fleetwood's Dispute Resolution Administrator, also deny seeing Jewell's preliminary report prior to the inspection. (Tr. 232-33, 292-302, 356.)

### B. *Fleetwood's Inspection on November 9, 2011*

On November 9, 2011, Haas inspected the RV on Fleetwood's behalf at River States Truck Sales in Eau Claire, Wisconsin. (Tr. 320-21, Ex. B; Terlep Aff. ¶ 10.) Prior to the inspection, the parties agreed that Fleetwood would not do any destructive testing or otherwise alter the RV, the Exes could observe from a distance, and no one would speak with them

---

[4] At his deposition on March 22, 2012, Krueckeberg testified that on November 9, 2011, he and Haas inspected the buss bar in particular "because of the allegation of the corrosion on the busbar." (Tr. 237-38; *see also* Tr. 248.) The allegations about the buss bar, however, first appeared in Jewell's August 1, 2011, report.

during the process. (Terlep Aff. ¶ 11; Ex. 9.)

The nearly seven-hour inspection was conducted inside the facility except for a test drive. (Tr. 255; Terlep Aff. ¶¶ 21-23.) Krueckeberg was present throughout the inspection, and Terlep was in the service area most of the time. (Tr. 227, 255-56.) Haas testified that he brought with him a computer bag, some documents, a notebook, a "CAN instrument," a voltmeter, and an orange (Tr. 321-22); and Krueckeberg brought a backpack that he testified contained documents, his laptop, a camera, and some snacks (Tr. 230, 249-50).

Initially, due to restrictions imposed by River States for insurance reasons, the Exes remained outside in the cold, watching the inspection through the bay's windows. (Terlep Aff. ¶¶ 13, 15; Tr. 58, 252.) After fifteen to twenty minutes, however, and because of the cold, Terlep convinced River States to permit the Exes to enter the rear of the service area, where they were to remain within three feet of the bay door and a few feet behind the rear of the unit. (Terlep Aff. ¶ 16; Tr. 59-60, 124, 252.) Occasionally, the Exes would wander beyond the established boundary in an effort to get a better view of the inspection. (Tr. 63-64, 124-25, 253.)

Due to their vantage point, the Exes had limited ability to observe what Haas and Krueckeberg were doing and never saw or heard (probably because of ambient noise) the use of any tools (Tr. 60-62, 65-67, 71, 115), but nevertheless thought the two acted "very suspicious" (Tr. 62, 214; *see* Tr. 66). Haas and Krueckeberg, in fact, did not bring any tools to the inspection, but did borrow a Phillips screwdriver from River States in order to open a compartment. (Tr. 257, 281.)

During the inspection, Haas thoroughly examined the RV, including the rear

5

compartment, where, for example, the buss bar and shiny bolt were located (Tr. 234, 236-37, 325, 328-29), and took nearly 100 photographs (Tr. 329), but did not single out the buss bar for pictures (Tr. 355-56). Both Haas and Krueckeberg (and Terlep, who the Exes do not specifically accuse of active spoliation) deny changing any bolts or screwing down the TriMark box (Tr. 334, 352, 368-69; Krueckeberg Aff. ¶ 10; Terlep Aff. ¶ 20; Haas Aff. ¶ 24), and indeed, the so-called shiny bolt and TriMark box are not even mentioned in Haas's subsequent report (Ex. B). Haas did do some minor things to the unit, however; the RV's batteries were low so he had to charge them to even conduct an inspection, and a fuse to the lavatory system was blown so he had to borrow one from River States for testing, but then put the old, blown fuse back in. (Tr. 257, 276, 281, 357, 368-69; Ex. B.)

Near the end of the inspection, Haas, Krueckeberg, and Terlep took the RV for a test drive, and the Exes followed in their car. (Haas Aff. ¶ 15; Terlep Aff. ¶ 21.) After the test drive, Fleetwood tested the slide outs and the leveling system, and the Exes watched Krueckeberg videotape this part of the testing. (Haas Aff. ¶ 16; Krueckeberg Aff. ¶¶ 12, 13; Terlep Aff. ¶¶ 23-24.)

*C. Jewell's Second Inspection on November 12, 2011*

On November 12, 2011, just three days after the Fleetwood inspection, Jewell reinspected the RV on the Exes' behalf. (Tr. 14, 96-97.) Richard Exe observed the inspection. (Tr. 14, 96-97.) In his report summarizing this inspection, Jewell observed that the basement compartment directly in front of the rear dual wheels on the passenger side, where the RV's batteries and the electrical and electronic components that operate the slide outs and leveling system are housed, was vented directly into the rear wheel well, which led him to conclude that

6

the rear wheels were throwing water into the compartment. (Ex. QQ.) In support, Jewell attached a photo to his report showing water stains flowing down from the vent. (Ex. 2.) Other photos of the compartment showed some surface rust on a buss bar and some apparent corrosion on the connecting bolts. (Exs. 2, MM.)

Jewell thought that one of the bolts on the buss bar in particular—the one that connects the RV's main electrical wire that serves at least twenty components in the RV—was shinier than the others, leading him to note in his report that "[i]t appears that one of the bolts connecting a circuit to the buss bar had been recently replaced." (Ex. QQ at 3.) At his deposition, Jewell elaborated that he also believed the old bolt had been switched out because of the appearance of its fastening nut, the buss bar surface the nut was secured to, the fact that the bolt was upside down (purportedly unlike the rest of the bolts on the buss bar) and because the corrosion that otherwise appears on the wire connectors does not appear near the bolt. (Jewell Dep. 140.) There is no evidence that either Fleetwood or its dealers ever changed the so-called shiny bolt (which is coated in cadmium; the others on the buss bar are coated in zinc) while previously doing warranty work on the RV. (Tr. 334-35, 347.)

Although not mentioned in his second inspection report, Jewell also testified that "[o]ne of the components that was flopping around in there was anchored down on [his] second inspection." (Jewell Dep. 208.) Richard Exe observed this as well, stating more precisely that the TriMark box that had been dangling from wires at Jewell's first inspection was now secured to a pre-existing wood block by two wood screws. (Tr. 46-48.) Why, however, Krueckeberg and Haas would have bothered to undertake this "fix" is unexplained since the relays going to the TriMark box "don't in any way relate to any of the problems that the Exes

7

were having," as they actually control the lights and door locks, not the slide outs or leveling system. (Tr. 234-35; *see* Tr. 275, 326-27.) And the motivation for the supposed repair is called into even greater question when it is realized that the lights and door locks had apparently been working just fine. (*See* Tr. 31.)

In any event, Jewell's observations, immediately following Fleetwood's inspection, led him to conclude that someone had replaced the shiny bolt and secured the flopping component after his first inspection a year prior. (Ex. QQ at 3; Jewell Dep. 138-39, 208.) According to the Exes, Jewell's conclusion means that Haas and Krueckeberg switched out a buss bar bolt and screwed down the TriMark box, because from November 2010 to November 2011 the RV had not been used or serviced and had only been stored in a climate-controlled storage facility to which the Exes, the owner of the facility, and the owner's father had access. (Tr. 31, 34-35.) Thus, as the Exes see it, only Fleetwood had both the motive and opportunity (i.e., the November 9, 2011, inspection) to replace the shiny bolt and secure the TriMark box. (Tr. 115, 117.)

*D. The Court's Credibility Determinations Concerning the Shiny Bolt and the TriMark Box*

Haas's and Krueckeberg's testimony denying they changed the shiny bolt or secured the TriMark box is believable and credible on a number of levels. And on these points, the testimony of Jewell and the Exes is less credible; that is, they have drawn incorrect inferences from their observations.

To explain, the Exes' contentions all stem from a comment made by Jewell in his second report, that "[i]t appears that one of the bolts connecting a circuit to the buss bar had been recently replaced" (Ex. QQ at 3), and his testimony at his deposition that "[o]ne of the

8

components that was flopping around in there was anchored down on [his] second inspection" (Jewell Dep. 208). But neither Jewell or the Exes took any photographs of the RV during Jewell's initial inspection, and thus the Exes have no "before" pictures of the bolt or TriMark box for comparison. Moreover, Jewell's comparison relies solely on his memory of events—his inspection—occurring one year earlier and all without the benefit of any notes or photographs upon which to refresh his recollection.

Although Richard Exe testified that he too saw the TriMark box unsecured at Jewell's initial inspection, he never mentioned this in his earlier deposition despite given ample opportunity to identify all of the RV's deficiencies. (Tr. 94-96.) Nor did Jewell mention the TriMark box specifically in his preliminary report, but simply indicated that "[a]n electrical assembly containing relays and various other electrical components, as well as the assembly's wire harness were not mounted, rather the assembly was left to flop around in a storage compartment under the entrance steps." (Ex. 3.) Of course, the fact that the TriMark box has external wiring slack is a design feature so the wires can be easily removed from the step for repair (Tr. 366-68), thus it is likely that this slack (and not the box itself) is what Jewell and Mr. Exe really saw. And Jewell, who had limited experience with RVs, probably misinterpreted this as "shoddy" workmanship. (Tr. 39.)

And the "shine" of the bolt (if it is shinier at all) is most likely explained by its cadmium coating, which is different than the others on the buss bar. (Tr. 347.) In fact, the shiny bolt in the Exes' RV is similar in appearance to the corresponding bolt in the pictures Fleetwood produced from three of its customers who own the same model RV. (*See* Tr. 267-73; *compare* Ex. MM, *with* Exs. J, L, N.) Those pictures also show similar corrosion on the

9

buss bar among all four units, undercutting the Exes' assertion that Haas or Krueckeberg used a wire brush to remove corrosion on the Exes' unit. (*Compare* Ex. MM, *with* Exs. J, L, N.)

Furthermore, the shiny bolt connects the RV's main electrical wire, which services approximately twenty-seven electrical components. (Tr. 262, 336-37, 339.) Haas would presumably have had to disconnect this wire, at least temporarily, when replacing the bolt and, consequently, all of the electrical components would simultaneously have lost power, including the interior lights to the compartment. (Tr. 262.) But the Exes do not report that such a power failure occurred during the inspection, and Richard Exe testified that he saw the lights on when Haas was examining the compartment where the buss bar is housed. (Tr. 206.) Moreover, the picture of the buss bar that Jewell took three days after Fleetwood's inspection shows a layer of dust on the wire connected to the shiny bolt similar to all the other surrounding wires (Ex. MM), indicative of a wire that had not been recently disturbed (*see* Tr. 160-64).

And Jewell was simply incorrect that the shiny bolt is the only one installed upside down on the buss bar. The photos show that, in actuality, two of the eight bolts on the buss bar are installed that way, as are others in similar Fleetwood units—apparently a decision Fleetwood technicians make during construction. (Tr. 358-60; Exs. NN, OO.) This misstatement undercuts the credibility of Jewell's testimony.

A few discrepancies do exist between Haas's and Krueckeberg's testimony, however—more particularly, with respect to whether they had some previous knowledge of the content of Jewell's preliminary report. Although Krueckeberg testified at the hearing that he had not seen Jewell's preliminary report prior to the inspection, he stated at his deposition that

they thoroughly examined the buss bar "because of the allegation of the corrosion on the busbar." (Tr. 237-38.) Also, Haas used the term "shiny bolt" at his deposition, attributing the term to Towers, but Towers had not yet used the term during the deposition. (Tr. 372-75). The Exes attempt to seize on these statements as evidence that Haas and Krueckeberg were lying when they denied any knowledge of the purported problems Jewell pointed to in his preliminary report. But on the other hand, Fleetwood *had* received a copy of Jewell's preliminary report at least by March 22, 2012, the date of Krueckeberg's and Haas's depositions. (Tr. 239-45, 248-49.) Thus, by the time they were deposed, Krueckeberg and Haas had at least become aware of the purported problems highlighted by Jewell, and thus offer a plausible and convincing explanation for their statements.

At bottom, the Exes' spoliation claim rests on the far-fetched proposition that Haas and Krueckeberg smuggled tools into the inspection with the intent of somehow fixing the RV (both unseen and unheard) while the Exes and an officer of the Court, Mr. Terlep, were in the vicinity, and after Fleetwood had already attempted to resolve those problems on multiple occasions prior to suit. Of course, the Exes admit that they did not see Haas or Krueckeberg bring any tools to the inspection, much less see them use any, leaving Mr. Exe to describe the smuggling theory as only a "possibility." (Tr. 115.) For these reasons as well, the vehement denials of both Haas or Krueckeberg are credible.

Haas and Krueckeberg both presented as—and their demeanor illustrated them to be—seasoned veterans of warranty inspections (Tr. 227-29; Haas Aff. ¶¶ 1-7; Krueckeberg Aff. ¶¶ 1-4); indeed, Haas testified that he has performed more than 200 inspections for Fleetwood and testified in approximately 40 cases (Tr. 369). Thus, they are well aware of the

11

duty to preserve evidence in litigation and, it can also be inferred, the likelihood that sanctions would flow for spoliating evidence. (*See* Tr. 253-54, 369.) To that end, Haas carefully noted in his written report the two actions he *did* take that day that could possibly be viewed as an alteration: his charging of the RV's batteries because they were nearly drained and, for testing purposes, the replacement of the blown lavatory fuse and its reinsertion afterward. (Ex. B.)

When considering all of the evidence—and, more particularly, the Exes' lack of evidence and mere speculation—I find Haas's and Krueckeberg's testimony that they did not replace the bolt on the buss bar or screw down the TriMark box to be compelling and credible.

### E. The Video[5]

The Exes contend that the RV's leveling system malfunctioned during Fleetwood's testing and that the malfunction was captured by Krueckeberg on video. (Richard Exe Aff. ¶ 8, July 19, 2012.) In Fleetwood's Rule 26 expert report summarizing the November 9, 2011, inspection, however, Haas stated that the leveling system operated normally. (Towers Aff. ¶ 6, Attach., July 24, 2012.) Although Haas's report indicated that "photographs were taken," it said nothing about any video (a process the Exes saw occurring), and only still pictures were served with the expert report. (Towers Aff. ¶ 6, Attach., July 24, 2012.)

On March 5, 2012, after he had received Fleetwood's expert report with the photographs, Towers contacted Terlep and inquired about the missing video. (Towers Aff. ¶ 7, Attach., July 24, 2012.) Terlep promptly responded:

> There was no video from the inspection. While we had a video camera there and while our witnesses were under the impression that they were shooting video, the DVD disk that was used was defective and did not record anything. Thus, we

---

[5] As explained *supra*, prior to the evidentiary hearing the Court deemed the record complete concerning the video. (Docket # 111.)

12

> have no video. The disk has been taken to a professional photography duplicator
> and we were advised that it was simply a bad/corrupted disk that did not record.
> The disk was purchased new and had not been previously used, so there was
> nothing we did at our end to corrupt the disk. I have the physical disk at my
> office and you are more than welcome to come and examine it.

(Towers Aff. ¶ 7, Attach., July 24, 2012.)

Per Tower's request, Terlep sent him the video, together with the DVD recorder that was used at Fleetwood's inspection, on March 12, 2012. (Towers Aff. ¶ 7, Attach., July 24, 2012.) In doing so, Terlep reiterated: "[A]s I have advised you, we have already sent this out in an attempt to retrieve the data, but have been advised that the disk is simply bad and did not record." (Towers Aff. ¶ 7, Attach., July 24, 2012.)

Several days later, Towers took the video to a computer shop, which promptly retrieved the data on the disk using standard software. (Towers Aff. ¶ 8, July 24, 2012.) Towers later provided a copy of the video to Terlep. (Towers Aff. ¶ 8, July 24, 2012.)

### III. CONCLUSIONS OF LAW

The motion for sanctions centers on three specific pieces of evidence: (1) "the shiny bolt"; (2) the "secured TriMark box"; and (3) the video taken at the inspection. The Exes contend that at the November 9, 2011, inspection Fleetwood attempted to repair the RV—and thus altered or destroyed evidence—by replacing the bolt that attaches the main electrical wire and by securing the TriMark box to a wood block with two wood screws. The Exes further assert that Fleetwood also committed spoliation by attempting to hide the video that purportedly shows a malfunction of the leveling system.

"Spoliation refers to the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable

13

litigation[.]" *Norington v. Poland*, No. 1:05-cv-63, 2009 WL 5069014, at *5 n.7 (S.D. Ind. Dec. 15, 2009) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)); *see also Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002) ("Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case."); *Rodgers v. Lowe's Home Ctrs., Inc.*, No. 05 C 0502, 2007 WL 257714, at *5 (N.D. Ill. Jan. 30, 2007) (same). "Federal trial courts have the inherent discretionary authority to make appropriate evidentiary rulings and to levy sanctions in response to the destruction or spoliation of relevant evidence." *Miller v. Four Winds Int'l Corp.*, 827 F. Supp. 2d 1175, 1179 (D. Idaho 2011) (addressing a motion for spoliation sanctions in a MMWA case) (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).

"Sanctions for spoliation of evidence include awarding reasonable expenses, attorney fees, barring evidence or arguments, permitting adverse inferences, and dismissing claims." *Krumwiede v. Brighton Assocs., L.L.C.*, No. 05 C 3003, 2006 WL 1308629, at *9 (N.D. Ill. May 8, 2006) (citations omitted). "Issue-related sanctions, such as adverse inferences, preclusion of the evidence, and jury instructions . . . may be imposed by preponderance of the evidence showings that a party's misconduct has tainted the evidentiary resolution of the issue." *Danis v. USN Commc'ns, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *34 n.22 (N.D. Ill. Oct. 23, 2000) (internal quotation marks and citation omitted). Although the Seventh Circuit Court of Appeals has held on at least one occasion that when seeking a sanction of a default judgment or dismissal with prejudice, the moving party must produce clear and convincing evidence of willfulness, bad faith, or fault, *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003), it "ha[s] subsequently suggested that the preponderance-of-the-evidence

standard is more appropriate" when seeking these harsher sanctions, *Negret v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721 (7th Cir. 2008).

At bottom, any sanctions rendered must be "proportionate to the offending conduct." *Jacobeit v. Rich Tp. High Sch. Dist. 227*, No. 09 cv 1924, 2011 WL 2039588, at *6 (N.D. Ill. May 25, 2011) (citing *Langley v. Union Elec. Co.*, 207 F.3d 510, 515 (7th Cir. 1997)). "Spoliation of evidence sometimes permits, but rarely if ever requires, the peremptory sanction of entry of default judgment." *Rodgers*, 2007 WL 257714, at *1 (citing *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153 (7th Cir. 1998)).

Here, the Exes fail to prove by even a preponderance of the evidence that either Haas or Krueckeberg spoliated evidence at the inspection by purportedly replacing an allegedly corroded bolt with a new bolt (and wire brushed the rust off the buss bar) or by screwing down the TriMark box, all in an effort to surreptitiously remedy the Exes' intermittent problems with the slide outs and leveling system. For the reasons recounted in Section II of this Report and Recommendation, Haas's and Krueckeberg's testimony denying that they changed out the bolt or screwed down the TriMark box is both compelling and credible.

And with respect to the TriMark box in particular, securing it would be a curious form of attempted spoliation since, as the Exes admit, the relays connected to the TriMark box have nothing to do with this litigation as they control the unit's lights and locks, *not* the slide outs and leveling system. (Tr. 234-35, 275, 326-27.) Put another way, the Exes offer the puzzling suggestion that they should receive a judgment from Fleetwood for the full value of the RV for the alleged spoliation of irrelevant evidence. But "[s]poliation of evidence occurs when one party destroys evidence *relevant* to an issue in the case." *Smith*, 293 F.3d at 988 (emphasis

15

added) (concluding that the defendant's destruction of a tank was not spoliation of evidence "because the tank itself shed no light on [the plaintiff's] claims that he owned it, protested its removal, or was assaulted") (citing *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2012)). Thus, Fleetwood simply had no motive to smuggle in wood screws to secure a component that everyone agrees would not fix the RV's alleged problems and which was irrelevant to the case.

The Exes' third incident of alleged spoliation fares no better. Their argument about the video is hard to follow, but apparently they contend that Fleetwood intentionally corrupted, or attempted to corrupt, the video in order to destroy evidence that the RV's leveling system purportedly malfunctioned at the inspection. But there is simply *no* evidence that Fleetwood corrupted or attempted to corrupt the video. Even though Fleetwood was unsuccessful in extracting data from the DVD, when the Exes inquired about the video, Fleetwood promptly turned it over to them, together with the recorder used to make the video. Ultimately, the Exes *were* able to recover the data on the DVD, and thus the evidence has not been destroyed, altered, or spoliated. *See YCB Int'l, Inc. v. UCF Trading Co., Ltd.*, No. 09-cv-7221, 2012 WL 3069683, at *9 (N.D. Ill. June 12, 2012) ("[T] be entitled to relief, [the moving party] must still first establish that discoverable information has been lost.").

Moreover, although the Exes penned nine pages of argument about the video, seven of those nine pages center on the content of the video. But the Exes' argument addressing the content of the video is premature. Whether the video actually evidences a malfunction of the leveling system is an issue to be determined by the trier of fact when assessing the merits of the Exes' claims under the MMWA.

For these reasons, the Exes fail to carry their burden of establishing that Fleetwood spoliated evidence by changing out a bolt on the buss bar, screwing down the TriMark box, or corrupting the video taken at its November 9, 2011, inspection. Consequently, I will recommend that the Exes' motion for sanctions be DENIED.

## IV. CONCLUSION

Based on the previous findings of fact and conclusions of law, I recommend that the Plaintiffs' Motion for Sanctions Based on Spoliation of Evidence (Docket # 73) be DENIED. For purposes of the motion for sanctions, Defendant's objections to the admission of portions of Jewell's deposition (Docket # 137) are DEEMED MOOT.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for Plaintiffs and Defendant. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. FED. R. CIV. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for the 26th day of July, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
